```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x    10 Civ. 5838
FERNANDO MARRERO,

                            Plaintiff,

    - against -



R-WAY MOVING & STORAGE, LTD.,

                            Defendant.
-----------------------------------------------------------x
```

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendant R-Way Moving & Storage Company submits this memorandum of law in support of its motion for summary judgment dismissing the complaint of plaintiff Fernando Marrero.

### Preliminary Statement

R-Way is a family owned moving and storage company headquartered in Queens in a warehouse located at 59-46 64th Street, Maspeth, New York. It is run by two brothers, Joe Rooney, a former City cop, and Chris Rooney, a former City fireman, who took over the business from their father about ten years ago. Joe Rooney does most of the job estimates for prospective clients. Chris Rooney runs the moves. Joe participates in most of the moves as well. (Christopher Rooney Affidavit ¶2).

R-Way relies on its moving staff of approximately five "regulars" whom Chris Rooney contacts when a move is scheduled. When a move requires more than these five men, R-Way relies upon a list of men who make themselves available on a part time basis. Marrero was one of these part-timers. According to Marrero, plaintiff began working for R-Way part time in 2006.

1

Again, according to Marrero, during the period between July 6, 2006 and April 15, 2010, plaintiff worked a total of 389 days at R-Way. (Rooney Aff. ¶6)

In his complaint, Marrero charges his co-workers and Chris Rooney with creating a hostile work environment by calling him a monkey or "monkey" and of taunting him with pictures and other monkey depictions. See ECF Docket 1- Complaint ¶¶18-21.

Marrero is of Hispanic origin. His allegation that he was subjected to a racially hostile environment while working at R-Way rests entirely upon the assertion that calling him a monkey is, without more, a racially derogatory term which is actionable under Title VII and the companion New York State Human Rights Law. As he explained at his deposition:

> Q. Do you regard the use of the term monkey as derogatory?
> A. Can you explain derogatory?
> Q. Do you think being called a monkey is a bad thing?
> A. Yes.
> Q. Why is that?
> A. Why? Because that's not my name.
> Q. Do you regard it as a slur?
> A. Yes, I do.
> Q. A slur of what sort?
> A. Racial.
> Q. But isn't it a racial slur that is ordinarily addressed to black people?
> A. Yes, it is.
> Q. So in what way did you understand it to be a racial slur in your case
> A. I took it as it was their way of not having to say spic.
> Q. What made you think that they wanted to say was spic?
> A. Well, you figure, I mean I figure. But my understanding of the way it was going was, monkey go get this. Or it was waking up the children of the customers, have them coming into the room I'm at, throw stuffed animals or monkeys at me and have the kids call me a monkey.
> Q. So you thought that the use of the term the monkey was derogatory because you

2

>     thought that what it really meant was spic?
> A.  Yes.
> (Egan Aff. Exh. 1 Marrero Dep. 44/15-45/22)

Marrero's claim for retaliation asserts that when he complained to Chris Rooney about being called "monkey", Rooney retaliated against him by not hiring him for any more moves.

Defendant makes this motion for summary judgment upon the grounds that "monkey" is not a racially pejorative term as applied to Hispanics in general and Marrero working at R-Way in particular. While he may have found being called a "monkey" irritating and insulting, he is without any proof that it was a racial taunt and indeed, the available evidence is to the contrary. If the conduct in which his co-workers engaged was not racially motivated and his complaint to Chris Rooney did not make plain that he thought such language was discriminatory, Marrero has no actionable claim for a hostile environment or for retaliation.

In arguing here that plaintiff is unable to prove that his co-workers' alleged conduct was racially motivated, R-Way is not conceding that plaintiff was called "monkey", that the conduct was "severe and pervasive" or that he ever reported the conduct to management. Rather, this motion rests on the hypothesis that, assuming _arguendo_ that the conduct alleged in the complaint actually occurred, Marrero has nevertheless failed to set out a prima facie case for either a racially hostile environment or for retaliation.

Furthermore, even if Marrero could make out a prima facie case of retaliation, R-Way has a legitimate non-retaliatory reason for hiring him part-time less frequently in the early months of 2010 which Marrero cannot demonstrate is pretextual.

Finally, Marrero has no federal claim because R-Way is not an "employer" for the purposes of Title VII. The statute defines an "employer" as any person engaged in interstate commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. 42 USC § 2000e(b). As is set forth in

3

the affidavit of Christopher Rooney, R-Way does not have enough employees working for the required period of time to be considered an "employer".

As is discussed at length below, R-Way is entitled to summary judgment dismissing Marrero's claim in its entirety.

## Summary Judgment Standard

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. Fed. R. Civ. P. 56, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); *Mandell*, 316 F.3d at 377. Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2458 (1986). After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial. Fed. R. Civ. P. 56(e)(2); *Liberty Lobby, Inc.*, 450 U.S. at 250, 106 S. Ct. at 2511. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. at 1356. There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party. *Liberty Lobby, Inc.* 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

I

## PLAINTIFF IS NOT ENTITLED TO ASSERT A CLAIM FOR HOSTILE WORK ENVIRONMENT

It is "axiomatic" that in order to establish a race-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct complained of occurred because of his race.

> A plaintiff claiming racially motivated hostility under Title VII must demonstrate that the conduct took place because of her race. See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (holding that it is "axiomatic" that plaintiff's claim of a hostile work environment based on her sex must show conduct took place because of her sex); Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2d Cir. 1989) (conduct complained of must have been prompted by victim's status).
>
> *Taylor v. Waterbury Bd. of Educ.*, 2007 U.S. Dist. LEXIS 32567, 12-14 (D. Conn. May 2, 2007)

The harassment must be evaluated on the totality of the circumstances. If the conduct complained of (here calling the plaintiff "monkey") is not on its face racially derogatory, the Court must look at all the evidence to determine if conduct occurred because of his race.

In this case there is no evidence that it was. R-Way's most senior employee, Danny Pimentel, is Hispanic as is another member of the "full time" staff, Angel Lopez. Indeed, Marrero accuses Angel Lopez of sending him pictures of a case of bananas on his cell phone, with a note suggesting that Chris Rooney had ordered some food for him. Egan Aff. Exh. 1, Marrero Dep. 92/16-24. Given that the alleged sender of the picture was himself Hispanic, plaintiff is unable to raise a question of fact as to whether Lopez's conduct was motivated by Marrero's race.

At R-Way, it was the practice of men working a move to call each other names. For example, Scott Adams is referred to as "Wolf" (Egan Aff. Exh. 2, Angel Lopez Dep. 27/4-6).

5

Joseph Kober was referred to as "Little Whopper" (pg. 79/23 - 80/3). Another employee was named "Big Whopper" (pg. 80/7-10). An employee named Jonathan was regularly referred to as "Toilet Bowl", and another was referred to as "Sarge" (pg. 77/16-23). Mike Faiella is referred to as "Meterman Mike" (Egan Aff. Exh. 3, Robbie Lee Dep. 37/14-20). According to Tony (Louis) Montefusco, Fernando Marrero referred to both Tony (Louis) Montefusco (Egan Aff. Exh. 5 Montefusco Dep. 33/23 – 34/6) and Scott Adams' girlfriend as a "pig" (39/2-5).

In *Payami v. City of New York*, 2007 U.S. Dist. LEXIS 25851. Pg. 19-20 (S.D.N.Y. Mar. 28, 2007) a male of Persian Jewish ethnicity and race complained that he was subjected to a hostile environment described by the court as follows:

> Conducting an independent search of the record in this case, **Plaintiff testified that, while stationed at the Midtown North Precinct, Defendant Sgt. Moynihan and other officers called him "bin Laden," asked him if he was "an informer for al Qaeda" or a "monkey,"** how often he "shave[d] [his] body," and whether he "wore a turban" or "rode a camel [*20] to work." (Bernstein Decl., Ex. A at 29/15-22, 35/19-23 (Plaintiff's Deposition Transcript, dated April 8, 2004); Payami Aff. PP 17-18). Plaintiff further testified that this name calling bothered him and that, despite asking Defendant Sgt. Moynihan to stop calling him names, Defendant Sgt. Moynihan continued to do so on a daily basis every time he saw Plaintiff. (Bernstein Decl., Ex. A at 29/19-25, 35/24-36/4; Payami Aff. P 23). (Emphasis Added)

Referencing the Supreme Court's holding in *Faragher*, 524 U.S. 775, 788 (1998) that the antidiscrimination laws were not intended to be a "general civility code", the Court held

> Moreover, nothing in the record indicates that the above changes to the terms and conditions of Plaintiff's employment were motivated by Plaintiff's race or ethnicity. The Court has carefully reviewed the record in this case, and in none of the aforementioned instances of harassment alleged by Plaintiff is there an insinuation, beyond Plaintiff's speculation, that the alleged actions were motivated by his race or ethnicity.

Id at 23

6

Plaintiff fails to set forth any basis for believing that the use of the term "monkey" by his co-workers, including the Hispanics on staff, was racially motivated, other than Marrero's "conjecture" that they were calling him "monkey" instead of "spic."

"Monkey" in certain contexts may be considered a racial slur against African-Americans. However, it is not a known racial slur against Hispanics and it has never been recognized by any Court as a substitute for the term "spic" as suggested by Plaintiff (Egan Aff. Exh. 1, Marrero Dep. 45/3-5.) Based on Plaintiff's reasoning, Marrero's co-workers could have called Plaintiff any other animal such as a lion or bear, and Plaintiff could allege it was substituted for a racial slur. Further, Plaintiff testified that there were at least three other Hispanic workers and one African American and no one ever referred to them as "monkey". (Egan Aff. Exh. 1 Marrero Dep. 44/5-10).

Plaintiff's unsupported conjecture that R-Way employees used the term "monkey" instead of "spic" cannot support a claim for a racially hostile environment. While subjectively Plaintiff may have made up in his mind that he was being discriminated against, no reasonable jury applying an objective standard could find the same.

While Plaintiff's nickname may have been rude or unpleasant, Title VII is not a general civility code. Nothing in the record indicates that the complained-of behavior was motivated by race.

II

MARRERO CANNOT MAKE OUT A
PRIMA FACIE CASE OF RETALIATION

Plaintiff contends that R-Way retaliated against him when he complained to Chris Rooney that he was being called a "monkey" and being harassed in the manner described in the complaint. ECF Docket 1- Complaint ¶24. The retaliation took the form of failing to call him into

7

work. According to the complaint, he was only called to work one day following the meeting with Chris Rooney which he says took place on March 10.

Plaintiff bears the initial burden of proving a prima facie case of retaliation by showing: (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between his engaging in the protected activity and the adverse employment action. *Gorzynsky v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

First of all, in his meeting with Chris Rooney on March 10th, Marrero did not engage in a protected activity. The transcript of that meeting is annexed to Rooney's affidavit as Exhibit 1. Rooney's recollection is that the transcript fairly describes what he recalls went on at the meeting. Rooney Aff ¶18.

At the meeting, Marrero complained about being called a "monkey". Rooney Aff. Exh. 1. Marrero said:

> Angel can talk all
> 19 the shit he wants to, 'cause I'm not stupid, I
> 20 didn't tell him that. He lost his security job.
> 21 He got pissed off because he sent me a fuckin'
> 22 message on my fuckin' phone with a fuckin'
> 23 barrel of bananas. I'm getting tired of this
> 24 shit, all right Chris?
> Tr 2/18-24
> And it took five
> 5 years, three years of that dealing with fuckin'
> 6 monkey this and fuckin' monkey that. Right or
> 7 wrong? Right or wrong?
> Tr 3/4-7
> Well I had no choice, 'cause uh,
> 18 um, I mean even you said a couple times, even
> 19 you said it like I heard you, and you handed me
> 20 a banana like it's a joke, it's not a joke to
> 21 me. It's seriously, seriously it bothers me, it
> 22 really bothers me but I have to, I have to
> 23 fuckin' sit on the sidelines, keep my mouth shut
> 24 while you yelled at me like I'm some little kid?
> 25 I dealt with this shit, I get sick. You used to
> 4
> yell, you yelled at me like 1 I was some little

8

```
2 kid, you just humiliate me in front of the guys,
3 like I'm some little child. I'm not a little
4 child, I'm 40 years old.
Tr 3/17 - 4/4
```

The law is clear that in order to be regarded as a "protected activity", Marrero's communication with Rooney has to convey enough information so that Rooney is alerted that complaint relates to conduct prohibited by Title VII. *Gilderhus v. Concentrix Corp.*, 113 FEP Cases 1187 (W.D.N.Y. 2011) (asking that bonuses be given to male employee and female employee for their work on failed project, stating that a certain female employee was unhappy with her pay, and her complaint about two supervisors for using company computers to carry on consensual sexual relationship would not qualify as protected activity) *Panzarino v. Deloitte & Touche LLP*, 107 FEP Cases 1146 (S.D.N.Y. 2009) (without reference to gender discrimination or antidiscrimination laws, official without notice that discrimination is alleged) *Krasner v. HSH Nordbank AG*, 108 FEP Cases 531 (S.D.N.Y. 2010) (complaints about an affair and impact on workplace is not report of hostile environment or sex discrimination.)

Marrero's statement quoted above does not meet this standard. Moreover, it was clearly not understood by Mr. Rooney to concern any claim of discrimination. Rooney Aff ¶19.

In addition, there is no causal connection between the foregoing statements by Marrero and Rooney's not asking Marrero to work on any further jobs. According to Marrero, this was not the first time that he had complained to Chris Rooney about being called a monkey. The first time he was called "monkey" in July 2008 at a job site in Manhattan, he complained to both Joe Rooney and Chris Rooney about it. There was no apparent reduction in the number of moves he was called to staff following this alleged report. See Egan Aff. Exh. 4, Response to Defendant's First Set of Interrogatories for Marrero's description of his first complaint to Joe/Chris Rooney, as well as his listing of his days worked.

9

He claims that he complained to Chris Rooney a second time in October 2008 when they were on their way back from a job in the Hamptons. Egan Aff. Exh.1, Marrero Dep. 87/7-88/15. There was no reduction in the number of jobs Marrero was called in on following this report about being called a monkey. See Egan Aff. Exh. 4, Response to Defendant's First Set of Interrogatories for Marrero's listing of his days worked.

Marrero also claims he complained to Chris Rooney about being called "monkey" in the early fall of 2009. There was no reported reduction in the number of jobs for which he was called in (See Egan Aff. Exh. 4, Response to Defendant's First Set of Interrogatories for Marrero's listing of his days worked). Given this history, there is no basis for arguing that the reduction in the number of jobs following the March meeting was causally related to Marrero's complaint.

Indeed, the transcript clearly suggests other non-discriminatory reasons why Rooney stopped calling. At one point, Marrero offers this explanation.

> You know, all of a
>
> 18 sudden you got pissed off that one time that I
> 19 called you and I couldn't come in that Saturday,
> 20 you called me that week after, and come in and
> 21 took the keys from me. Right? That's where the
> 22 shit started. And ever since then, you had a
> 23 grudge against me, all right? Chris, you know
> 24 what, there's no need to talk about it.

Tr 5/17-25

But the non-discriminatory explanation of why Chris Rooney didn't call Marrero with further work is that Chris thought Marrero quit. Marrero was very angry at this meeting. Rooney Aff. ¶19-23. Rooney tried to get him to sit down but Marrero refused and said;

> ...why should I sit here when I
> 15 know I'm not comin' back to work? Why should I
> 16 sit here? Nothing's gonna change it for you.

10

> 17 You don't like me, I could care less. Straight
> 18 up and back, I could care less.

Rooney responded:

> If you, if you want to, if you want
> 22 to leave today and you don't want to work for us
> 23 no more, Fernando I understand, I understand
> 24 that. If you want to go and you want to leave
> 25 and you want to go find something else, I
> 8
> understand that, okay? If 1 you're not happy
> 2 here, no problem. But to leave pissed off by
> 3 telling me, you know, if you want to tell me off
> 4 and walk away - - me and leave off on bad terms,
> 5 I don't think that's the right way to go about
> 6 it.

Thus, even if Marrero had engaged in a protected act when he complained about being called "monkey", he cannot establish the requisite causal connection between the protected activity and Rooney's not contacting him for any further work. Rooney did not call Marrero because Marrero told him he did not want to work at R-Way anymore.

In any event, R-Way had a legitimate non-discriminatory reason for not calling Marrero in the first three months of 2010. R-Way's business was slow. R-Way's is almost always slow in the winter. Rooney Aff. ¶15. Customers tend to move when the weather is nicer.

Though R-Way does not keep any records of the numbers of moves it makes or when they occur, a review of the information provided by Marrero in this litigation supports this observation. In each of the years Marrero worked for R-Way, he worked less in the first and fourth quarters, significant portions of which have bad weather than he did during the spring and summer when the weather was better. Rooney Aff. ¶9.

Thus, because R-Way advances a legitimate, non-retaliatory reason for being unable to provide work for Plaintiff; and unless Plaintiff can offer something more than his own conclusory allegations that Rooney did not hire him after the meeting in March 2010 because he

11

complained about being called a "monkey" to challenge this reason or meet his ultimate burden of proving retaliation, a grant of summary judgment on this claim is appropriate. See *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (holding that party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful").

III

PLAINTIFF DOES NOT HAVE A CLAIM
UNDER TITLE VII BECAUSE R-WAY IS NOT
AN EMPLOYER

Title VII only applies to employers having 15 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. 42 U.S.C 2000e(b). R-Way is not such an "employer".

As Rooney states in his affidavit, R-Way has two kinds of employees who work on moves: "regular" employees who are called each time there is a move and "part time" employees who are called whenever there are not enough regular employees to staff a move. R-Way typically has about 5 regular employees at a time. Though R-Way refers to its regular employees as "full timers", in fact, they are only paid when they work on a move. The only truly full time employees of R-Way are Joe and Chris Rooney and their wives. Until April 2011, R-Way also had a bookkeeper who worked part time in the office, Ed Vecchio. (Rooney Aff. ¶4)

There are legal questions whether and under what circumstances part time employees count as employees under the "payroll method" approved by the Supreme Court in *Walters n Metropolitan Educational Enterprises*, 519 U.S. 202 (1997). It is also not clear that Joe and Chris Rooney as owners of the business should be counted as employees. *Fitzgibbons v. Putnam Dental Assoc.*, 368 F. Supp. 2d 339 (S.D.N.Y. 2005). However, even if one resolves all of those questions in plaintiff's favor, R-Way is still not an "employer" for the purposes of Title VII.

12

Counting everyone, R-Way did not have 15 or more persons employed each of twenty or more calendar weeks in the current or preceding calendar year.

Only rarely does R-Way have moves every day of a week. During the fall and the winter when work is slower than it is during the spring and summer, R-Way never works each working day in the week. It is therefore not clear that it can be said that there is any 20 week period when R-Way has more than the Rooneys working. (Rooney Aff. ¶9)

But even if there were a twenty week period in which more than 4 employees were working every day of the week, there were not 15 of them doing so. As Rooney explains in his affidavit, in order to have 15 employees working, he has to be using 10 employees on a move. Taking into account the fact that Joe and Chris Rooney typically work most moves, it is only moves involving 12 men that would bring the number of people employed by R-Way to 15 on any given day 12 men moves are infrequent and certainly do not occur every day during any 20 week period. (Rooney Aff. ¶7-10)

The burden is on plaintiff to demonstrate that R-Way satisfies the definition of employer and that he has a claim under Title VII. Plaintiff cannot meet that burden.

## CONCLUSION

For all the foregoing reasons, this Court should grant defendant's motion for summary judgment and dismiss Marrero's complaint in its entirety.

Dated: New York, New York
April 2, 2012

EGAN LAW FIRM

_____
By: Susan B. Egan
Attorney for
805 Third Avenue
New York, New York 10022
(212) 619-8456
segan@eganattorneys.com
