UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

FERNANDO MARRERO,

        Plaintiff,                              Memorandum and Order

                                                              10 Civ. 5838

   - against -

R-WAY MOVING & STORAGE, LTD.,

        Defendant.
------------------------------------------------------x

GLASSER, United States District Judge:

Plaintiff Fernando Marrero ("Marrero" or "plaintiff") brought this action against his former employer, R-Way Moving & Storage, Ltd. ("R-Way" or "defendant"), alleging race-based discrimination, a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq. (McKinney 2010). Before the Court is defendant's motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendant's motion is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed, unless otherwise noted. R-Way is a moving company based in Maspeth, New York, owned by Joseph and Christopher Rooney. Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1") ¶¶ 1-2. During the relevant time period, R-Way had four full-time employees: Joseph

1

Rooney, Christopher Rooney, and their wives. Id. ¶ 17. R-Way also employed a part-time bookkeeper, Ed Vecchio. Id. ¶ 16. The parties dispute the number of movers employed, but they agree that these movers are divided into full-time or "regular" movers,[1] who were contacted every time there was a moving job, id. ¶¶ 3-4, and numerous part-time workers who are contacted when the regular workers are unavailable or when a moving job requires additional workers, id. ¶ 5; Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("Pl.'s 56.1") ¶ 10.

R-Way employed plaintiff as a part time worker from July 6, 2006 to April 15, 2010. Def.'s 56.1 ¶ 6; Compl. ¶ 2. Plaintiff alleges he initially worked as a "shaper," meaning he called R-Way each morning and was given assignments based on R-Way's needs. Compl. ¶ 14. In the spring of 2007, plaintiff alleges he was promoted to "elevator," meaning that he was paid more, was given better assignments, and worked more regularly than a "shaper." Compl. ¶ 15. At approximately the same time, plaintiff alleges he began to be subjected to harassment based on his race and skin color. Plaintiff self-identifies as non-White Hispanic. Pl.'s 56.1 ¶¶ 1-2; Compl. ¶ 2.

Plaintiff alleges he was subjected to daily racial harassment at R-Way. This harassment allegedly began in July 2007 when two regular workers, Montefusco and Lee, called him a "monkey" and placed a banana near him. Affidavit of Ferdinand Marrero dated April 30, 2012 ("Marrero Aff.") ¶ 23. Later that day, they allegedly called plaintiff at home on his cell phone and made monkey noises, which plaintiff's children overheard. Id.; Affidavit of Susan B. Egan dated April 2, 2012 ("Egan Aff.") Ex. 1 ("Marrero Dep."), at 47. Montefusco admitted that he called plaintiff "monkey" but

---

[1] Plaintiff alleges there were at least six regular or full-time movers: Danny Pimentel, Frank Rosa, Neil Brady, Louis Anthony "Tony" Montefusco ("Montefusco"), Scott "Wolf" Adams, and Robbie Lee ("Lee"). Marrero Aff. ¶ 12.

testified that the nickname originated with plaintiff, who referred to himself as a "silver-back gorilla" due to his grey hair.  Affidavit of Michael Resko dated April 30, 2012 ("Resko Aff.") Ex J ("Montefusco Dep."), at 29-31.

From that day onward, R-Way employees allegedly referred to plaintiff almost exclusively as "monkey."  Marrero Aff. ¶ 25.  Plaintiff also alleges R-Way employees repeatedly taunted him with monkey and gorilla toys or stuffed animals, which sometimes were dressed in an R-Way t-shirt with plaintiff's name written on it.  Marrero Aff. ¶ 26; see also Affirmation of Joseph Amadiz dated April 23, 2012 ("Amadiz Aff.") ¶ 13; Marrero Dep. at 52-53, 68.  When plaintiff removed the toys, they were quickly replaced.  Marrero Dep. at 66.  On one occasion, R-Way employees allegedly induced a customer's child to throw a monkey toy at plaintiff.  See Marrero Dep. at 45; Amadiz Aff. ¶ 13.  On another occasion, Montefusco allegedly said to plaintiff, "Hey monkey, turn around," and then threw a small red cloth monkey at plaintiff.  Marrero Dep. at 69.  R-Way employees also allegedly posted a depiction of a chimpanzee inside a company truck, with plaintiff's name written on it.  Id. at 68.[2]

In the late summer of 2009, R-Way employees allegedly hung a poster in the R-Way warehouse, depicting a monkey drinking from a bottle of alcohol.  Handwritten across the top of the poster was the message, "Have you seen our monkey?  Reward if found $$$."  Next to the monkey is plaintiff's first name, "Fernando," and across the monkey's chest is written "R-Way."  See Resko Aff. Ex. C.  Plaintiff alleges at least 10 copies of the poster were hung in the R-Way warehouse and offices.  Marrero Aff. ¶ 28; see also Amadiz Aff. ¶ 19 (stating he saw the poster hanging in the R-Way warehouse);

---

[2] Plaintiff testified the image was that of a particular chimpanzee who inflicted horrific and life-threatening injuries on a woman in Connecticut.  See Andy Newman, Pet Chimpanzee Attacks Woman in Connecticut, N.Y. Times, Feb. 17, 2009.

3

Resko Aff. Ex. K (Vecchio Dep.), at 47-48 (testifying he saw the poster in the R-Way warehouse). Near the posters, at the entrance to the warehouse, a stuffed purple monkey was hung from the ceiling. Marrero Dep. at 59-60. Plaintiff took down many of the posters, but alleges the purple monkey and some of the posters were too high for him to reach and were still hanging when he stopped working there on April 19, 2010. Marrero Dep. at 58-59.

      Plaintiff alleges that he complained several times to Chris Rooney about being called "monkey," which he interpreted to be racially derogatory. Marrero Aff. ¶ 29. The first time he allegedly complained was the morning after Montefusco and Lee called him and made monkey noises. Marrero Dep. at 51. Plaintiff testified that he was so angry, he attempted to physically confront the two men but Chris Rooney intervened and told him "you got to roll with the punches." Id. Plaintiff also submitted an affidavit from Joseph Amadiz, a part-time worker at R-Way, who stated that in November 2007 he was riding back from a moving job with Marrero and heard Marrero complain to one of the Rooney brothers about being called "monkey." Amadiz Aff. ¶ 17. Plaintiff alleges he also complained to Chris Rooney in October 2008 regarding the monkey comments and stated he considered the comments "racial." Marrero Dep. at 88. Rooney allegedly again told plaintiff to "roll with the punches" and "just deal with it." Id. Defendant denies plaintiff ever complained or that Chris or Joe Rooney were aware of the taunts.

      Plaintiff alleges that on March 10, 2010 he again complained to Chris Rooney about the harassment. Compl. ¶ 24; Marrero Aff. ¶ 22. Plaintiff alleges that during this conversation, Rooney called him a "fucking monkey." Compl. ¶ 24; Marrero Aff. ¶ 22. Following this exchange, plaintiff alleges his hours were severely reduced and his employment was constructively terminated. Compl. ¶ 25; Marrero Aff. ¶ 22 ("I was

4

called to work on only 4 days in the 6 weeks immediately following my complaint to Chris Rooney on March 10, 2010."). Plaintiff recounted that during that time, he had an argument with Angel Lopez, another Hispanic employee, who participated in the harassment. Lopez allegedly sent plaintiff a text message with a picture of a case of bananas and the message, "Chris says there is no work, he ordered some food, go unload this." Marrero Dep. at 92. Plaintiff then called Lopez: "I told him straight up, 'You're an Uncle Tom. Why are you following them? This is not a joke to me. You know as well as I know that I'm taking this very – like it is being discriminated.'" Marrero Dep. at 100.

On April 19, 2010, the last day plaintiff worked for R-Way, plaintiff confronted Chris Rooney regarding his reduced hours and the harassment he suffered. Marrero Aff. ¶ 30; Affidavit of Christopher Rooney dated April 2, 2010 ("Rooney Aff.") Ex. 1 (Transcript). Plaintiff recorded that conversation, using his mobile phone:

> CHRIS: Fernando? Some, some of the guys are telling me that you're unhappy, that, you know, things that they say and everything like that, you know. If you don't want to work here, I understand. . . . But they said something that's bothering me, you know, they said you were going to sue me and I don't know . . .
> . . . .
> FERNANDO: I'm getting tired of this shit, all right Chris? I gave you five years, five years and you're tellin' me that you got no work for me but you got a whole line of cars sittin' outside that I have seniority over them, okay? Right or wrong Chris? Right or wrong? I have seniority over 'em. And it took five years, three years of that dealing with fuckin' monkey this and fuckin' monkey that. Right or wrong? Right or wrong?
>
> CHRIS: Fernando, listen. I had talked to you about—if that's what's still bothering you, okay, you handle that amongst the men. You handle it with, with, with the guys. I'm not gonna tell 'em to do this or don't do that. I spoke my piece about it when it first started, I said knock it off, okay? And then you were fine with it and you were jokin' back and forth with it.

5

> FERNANDO: Well, I had no choice, 'cause uh, um, I mean even you said it a couple times, even you said it like I heard you, and you handed me a banana like it's a joke, it's not a joke to me. It's seriously, seriously it bothers me, it really bothers me but I have to, I have to fuckin' sit on the sidelines, keep my mouth shut, while you yelled at me like I'm some little kid? I dealt with this shit, I get sick. You used to yell, you yelled at me like I was some little kid, you just humiliate me in front of the guys, like I'm some little child. I'm not a little child, I'm 40 years old. . . . I bit my tongue because I needed the job, but then I'm gonna sit down and then I come here and I see, every time I come here, I see somebody, people that are under me workin'? No, that's not cool Chris. . . .
>
> You know, you got, you got pissed off. You know, all of a sudden you got pissed off that one time that I called you and I couldn't come in that Saturday, you called me that week after, and come in and took the keys from me. Right? That's where the shit started. And ever since then, you had a grudge against me, all right? . . . You know what? This is it, I won't be callin' you no more. . . .

On May 26, 2010, plaintiff filed a charge with the New York State Division of Human Rights. Compl. ¶ 8. As part of the dual-filing system, this complaint was also filed with the Equal Employment Opportunity Commission ("EEOC"). Id. ¶ 9. On December 2, 2010, the EEOC issued a Notice of Right to Sue. Id. ¶ 11. Plaintiff filed the Complaint on December 16, 2010. Id.

## JURISDICTION

This Court has original jurisdiction over plaintiff's Title VII claims. The Court also has supplemental jurisdiction over plaintiff's state law discrimination claims. Federal courts have supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. §

6

1367(a).  A state law claim forms part of the same controversy if the state and federal claim "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).  Here, the parties and alleged events and injuries that form the basis of plaintiff's federal claims are identical to those that form the basis of plaintiff's state law claims.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As an initial matter, the moving party has the burden of demonstrating that no genuine dispute of material fact exists for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Once the moving party has met this burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting Matsushita, 475 U.S. at 586–87). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

The Court is compelled to draw all reasonable inferences in favor of the nonmoving party, Matsushita, 475 U.S. at 586, and a genuine dispute exists if a reasonable jury could find in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50 (citations omitted). "[T]he mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247–48 (emphasis in original). "Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth 'concrete particulars' showing that a trial is needed." R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984) (quoting S.E.C. v. Res. Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978)).

II.     **Material Issues of Fact Exist as to Whether Defendant is an "Employer" under Title VII**

As an initial matter, defendant moves for summary judgment on all of plaintiff's federal claims on the grounds that plaintiff has failed to show R-Way has fifteen or more employees, a requirement of Title VII. See 42 U.S.C. § 2000e(b) ("The term 'employer'

8

means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . ."); Walters v. Walters v. Metro. Educ. Enters., 519 U.S. 202, 117 S. Ct. 660, 136 L. Ed. 2d 644 (1997) ("[T]he ultimate touchstone under § 2000e(b) is whether an employer has employment relationships with 15 or more individuals for each working day in 20 or more weeks during the year in question.").[3] This employee-numerosity requirement is not a jurisdictional prerequisite, but rather an element of plaintiff's claim for relief. Arbaugh v. Y & H Corp., 546 U.S. 500, 516, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006).

Plaintiff's claims relate to conduct during his employment in 2007, 2008, 2009, and 2010. Therefore, to meet the employee-numerosity requirement of Title VII, he must show that defendants employed fifteen or more people for twenty weeks in calendar year 2006, 2007, 2008, 2009 or 2010. See, e.g., Jacobson v. Int'l Tours & Events, LLC, No. 09 Civ. 1050 (JCH), 2010 WL 5211488, at *2 (D. Conn. Dec. 16, 2010). The statute does not require that those twenty weeks run consecutively. To determine how many employees an employer has for purposes of Title VII, courts frequently use a test known as the "payroll method," looking to an employer's payroll to determine the number of individuals it employs. See Walters, 519 U.S. at 206. The Court's inquiry is frustrated in this respect by the fact that defendant claims to keep no payroll records or, indeed, any record of the number of movers employed, the identity of those employees, what dates they worked, what they were paid, or even how many moving jobs R-Way

---

[3] In contrast, the NYSHRL applies to any business with four or more employees. N.Y. Exec. Law § 292(5) (defining an "employer" to exclude "any employer with fewer than four persons in his or her employ"). It is undisputed that R-Way had at least four employees. Def.'s Mem. at 12 ("The only truly full time employees of R-Way are Joe and Chris Rooney and their wives.").

completed between 2007 and 2010. See Def.'s 56.1 ¶¶ 24-25; Resko Aff. Ex. M ("Rooney Dep."), at 94-95. Instead, defendant relies entirely upon the affidavit of Chris Rooney that R-Way had four full-time managers (the two Rooney brothers and their wives), one part-time bookkeeper (Ed Vecchio), and used no more than 5 movers on average, for a total of less than ten employees at any time. Def.'s 56.1 ¶¶ 15-19; Rooney Aff. ¶¶ 4-10

Viewed in the light most favorable to plaintiff, there is ample evidence from which a reasonable jury could conclude R-Way had the requisite number of employees. For example, plaintiff worked nearly every working day in June, July, August, and October of 2007, a total of approximately 20 weeks. See Marrero Aff. ¶ 15; Pl.'s Response to Interrogatories at 7. Because plaintiff was a junior part-time employee at that time, a reasonable fact-finder could conclude that full-time employees and more senior part-time employees would have worked more than plaintiff did during that period. Rooney Dep. at 75 (testifying that because plaintiff was a junior employee, there were "a lot more men" he would have given work to, first); id. at 77 (testifying that Joe Nastazio, a part-time mover senior to plaintiff, worked more days than plaintiff did in 2007); see also Montefusco Dep. at 15 (testifying that "full time" workers consistently work five days a week). Chris Rooney testified that even as late as 2010, there were 12 part-time movers who had seniority over plaintiff and therefore would have received more work. Rooney Dep. at 93. Plaintiff's affidavit states that the typical job employed 20 to 25 moving men using five moving trucks. Marrero Aff. ¶¶ 14, 16. Former R-Way employee Joseph Amadiz corroborated that figure. Amadiz Aff. ¶ 6 ("On each of the moving jobs I worked, there were approximately 20-30 men on each job, including approximately 10 to 15 men I identified as 'regulars.'").

Although these affidavits conflict with Chris Rooney's testimony, a jury could

conclude Rooney's testimony is not credible in light of numerous self-serving inconsistencies and evasive answers. In addition, further evidence in the record also supports plaintiff's testimony. Defendant's response to interrogatories lists seven "full-time" employees and 11 part-time movers who worked at R-Way during the time plaintiff was employed. Resko Aff. Ex. H. To that list should be added the Rooneys' wives, who worked full-time. The list also omits Rob Flarey, a truck driver, see Egan Aff. Ex. 2 (Lopez Dep.), at 20, and eleven part-time movers recorded in the parties' exhibits: Jim Keenan and Mike Ferrara, see Resko Aff. Ex. E; Jospeh Amadiz, see Afadiz Aff.; M. Daly, R. Metz, W. Kober, T. McMahon, T. Manino, and R. Battaglia, who all received Christmas bonuses from R-Way, see Resko Aff. Ex. I; Mike Tedesco, nicknamed "Meterman Mike," see Montefusco Dep. at 35, and Ed Vecchio, Jr., Egan Aff. Ex. 2 (Lopez Dep.) at 34-35. In total, there are 11 full-time employees and 23 part-time employees recorded as having worked at R-Way at some time during the relevant period. This number is consistent with Chris Rooney's admission that he had the telephone numbers of approximately 35 movers in his cell phone contact list. Rooney Dep. at 58-60.

    For the foregoing reasons, a reasonable jury could find that R-Way met the employee-numerosity requirement of Title VII and thus defendant's motion for summary judgment on these grounds must be denied.

### III. Hostile Work Environment

    To survive a summary judgment motion on a hostile work environment claim, "[p]laintiff must introduce evidence showing that his workplace was permeated with discriminatory intimidation, ridicule, and insult, which was sufficiently <u>severe or pervasive</u> to alter the conditions of the victim's employment and create an abusive work

environment." Davis-Bell v. Columbia Univ., No. 10 Civ. 4362 (CM), 2012 WL 946680, at *14 (S.D.N.Y. Mar. 19, 2012) (emphasis in original) (quotation and citations omitted). In order to prove that a workplace is "hostile," a plaintiff must demonstrate that: "(1) he subjectively perceive[d] the environment to be abusive; (2) the conduct alleged objectively created an environment that a reasonable person would find hostile or abusive; and (3) that the work environment was abusive to employees because of their race, gender, religion, or national origin." Cunningham v. N.Y.S. Dep't of Labor, 326 F. App'x 617, 620 (2d Cir. 2009) (summary order) (quotation and citation omitted).[4] A work environment's hostility is assessed based on the totality of the circumstances. Harris v. Forklift Sys. Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

Defendant moves for summary judgment on the grounds that plaintiff has failed to show his workplace was hostile "because of" his race. Defendant argues that "monkey," "may be considered a racial slur against African-Americans [but] it is not a known racial slur against Hispanics. . . ." Def.'s Mem. at 7. Therefore, defendant argues "monkey" is a race-neutral term and plaintiff has failed to show any contextual grounds, other than his own conjecture, for interpreting "monkey" to be an ethnic slur. In making this argument, defendant misconstrues two Fourth Circuit cases for the astonishing proposition that "if the person called a monkey is not also called a "nigger" or any other demonstrably racial pejorative and isn't also African American, the word 'monkey' has no racial content." Def.'s Reply Mem. at 2 (citing White v. BFI Waste Servs., LLC, 375 F.3d 288 (4th Cir. 2004); Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir. 2001). The Court discerns no such rule from these cases. Nor did the Fourth

---

[4] Hostile work environment claims under Title VII and the NYSHRL are analyzed using the same standard. Citroner v. Progressive Cas. Ins. Co., 208 F. Supp. 2d 328, 339 (E.D.N.Y. 2002) (citations omitted).

12

Circuit suggest that "monkey" is only offensive to African-Americans.  To the contrary, the Fourth Circuit observed that "'[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'"  White, 375 F.3d at 298 (quoting Spriggs, 242 F.3d at 185).

Thus, the fact that plaintiff is not specifically of African heritage would not prevent a jury from concluding "monkey" was a derogatory reference to his race.  Plaintiff self-identifies as a dark-skinned, dark-haired Hispanic man.  Marrero Dep. at 43.  He testified he understood "monkey" to be a reference to his physical appearance.  Id. at 44-45.  Plaintiff also submitted an affidavit from a Hispanic co-worker, Joseph Amadiz, who witnessed plaintiff being called "monkey" and interpreted "monkey" to be a derogatory reference to plaintiff's race.  Amadiz Aff. ¶ 11.  As plaintiff rightly notes, although nicknames were common between employees at R-Way, none of the nicknames given to other employees had any racial connotation.[5]  Pl.'s Mem. at 10.

Although at least one of the employees who called plaintiff "monkey," Angel Lopez, was Hispanic, a rational jury could still conclude that "monkey" was a racial slur.  Plaintiff described an argument he had with Lopez after Lopez taunted him with monkey jokes.  Plaintiff called Lopez an "Uncle Tom" and criticized Lopez for "following them," Marrero Dep. at 100, the plain implication being that Lopez should not collaborate in discrimination against one of his own race.  Furthermore, the term "Hispanic" means only "Spanish-speaking, esp. applied to someone of Latin-American descent living in the United States."  Oxford English Dictionary (2d ed. 1989)   Like

---

[5] Other employees' nick-names included: "Wolf," "Little Whopper," "Big Whopper," "Toilet Bowl," "Sarge," and "Meterman Mike."  Def.'s Mem. at 6.

13

Latin-America itself, the term encompasses a wide range of races and ethnicities, see, e.g. Paul Taylor et al., When Labels Don't Fit: Hispanics and Their Views of Identity, Pew Research Center (April 4, 2012), available at http://www.pewhispanic.org/files/2012/04/PHC-Hispanic-Identity.pdf (reporting on the diversity of racial, national, and cultural affiliation of those Americans considered "Hispanic"), and discrimination sometimes occurs between these groups. For the same reason, although other Hispanic men at R-Way were not called "monkey," it is not implausible that one Hispanic man, of darker skin or differing ethnicity, should be targeted for his physical appearance while others are not. See Marrero Dep. at 43 (testifying that plaintiff was darker-skinned than the other Hispanic employees).

For the foregoing reasons, a reasonable jury could find that plaintiff was taunted and harassed because of his race and defendant's motion for summary judgment on plaintiff's hostile workplace claims must be denied.

## IV. Retaliation

Plaintiff alleges that he complained to Chris Rooney on March 10 about the hostile work environment he was experiencing and that after he complained, Rooney retaliated against him by reducing his working hours. See Compl. ¶ 25 ("Following [the March 10] exchange, plaintiff had been called to work only one (1) day (April 15, 2010) in the approximate month immediately thereafter, and his employment had been actually and constructively terminated in retaliation for his complaining. . . .").[6] Title VII makes it unlawful for an employer to discriminate against an employee "because he [or she] has opposed any practice made an unlawful employment practice by this

---

[6] Plaintiff variously records this confrontation as occurring on April 15, 2010 and April 19, 2010. Compare Compl. ¶ 2

14

subchapter, or because he [or she] has made a charge . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Retaliation claims, like discrimination claims, are subject to the McDonnell Douglas burden-shifting analysis.[7] Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010). To make out a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (quotation omitted).

Defendant seeks summary judgment on two grounds: first, on the grounds that plaintiff did not engage in a "protected activity" because plaintiff did not alert Rooney that he was complaining about conduct prohibited by Title VII or the NYSHRL; second, on the grounds that even if the March 10 conversation constituted "protected activity," plaintiff has failed to show a causal connection between the protected activity and any adverse employment action.

**A. Plaintiff has shown he engaged in protected activity**

To constitute protected activity, the plaintiff must have taken action to protest or oppose statutorily prohibited discrimination. "While the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-

---

[7] Retaliation claims under Title VII and the NYSHRL are governed by the same standards. See Carmody v. Vill. of Rockville Ctr., 661 F. Supp. 2d 299, 324 (E.D.N.Y. 2009) (citations omitted).

15

workers who have filed formal charges.'" Cruz v. Coach Stores, Inc., 202 F. 3d 560, 566 (2d Cir. 2000) (quoting Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). Specific reference to Title VII is not required but "the employer had to have been aware of the complaint and must have understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Marks v. Nat'l Communications Ass'n, Inc., 72 F. Supp. 2d 322, 336 (S.D.N.Y. 1999) (citing Galdieri–Ambrosini v. Nat'l Realty & Devel. Corp., 136 F.3d 276, 292 (2d Cir. 1998)).

Defendant argues that Marrero's March 10 conversation with Rooney did not meet that standard and therefore plaintiff has not shown he engaged in protected activity. Standing alone, the March 10 complaint did not constitute protected activity: plaintiff testified that the only thing he complained of on March 10 was that Chris Rooney was ignoring seniority in assigning work. He did not complain about being called "monkey." See Marrero Dep. at 85, 91. However, the March 10 conversation was not the only complaint plaintiff made. Plaintiff alleges he complained to Rooney specifically about being called "monkey" in July 2007 when the harassment began, Marrero Aff. 29; Marrero Dep. at 51, in November 2007, Amadiz Aff. ¶ 17, in October 2008, Marrero Dep. at 88, and in the late summer of 2009, Pl.'s Resp. to Interrog. At 2. Plaintiff also complained about being called "monkey" on April 19. See Rooney Aff. Ex. 1 (Transcript) at 3. These complaints were sufficient to constitute protected activity. See, e.g., Crawford v. Metro Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 275, 129 S. Ct. 846, 850, 172 L.Ed. 2d 650 (2009) (reporting harassing and "inappropriate behavior" by co-workers to a superior qualifies as "opposition").

16

### B. Plaintiff has failed to show a causal connection between his protected activity and any adverse employment action

However, plaintiff has failed to show a causal connection between that protected activity and any adverse employment action.  Plaintiff does not allege that defendant retaliated against him for any of the complaints in 2007, 2008, or 2009.  Plaintiff alleges defendant only retaliated against him after the March 10, 2010 complaint, when Rooney drastically reduced his hours, constructively terminating him.  Among other things, causation may be proved "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence. . . ." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001) (quotation omitted).  But the record demonstrates that plaintiff's hours were reduced <u>before</u> he allegedly complained on March 10.  See Marrero Aff. ¶ 21 (recording that plaintiff worked two days in February, five days in March and one day in April 2010); Marrero Dep. at 81-82 (testifying that his hours were reduced beginning in February 2010).  "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001).

The February reduction in hours also came long after plaintiff's prior complaint in 2009 about racial harassment.  See Pl.'s Response to Def.'s First Interrogatories at 2 (stating the prior complaint occurred in "late summer or early fall 2009" when plaintiff complained to Rooney about being called monkey).  A delay of four or five months does not support an inference of retaliation.  See Flood v. UBS Global Asset Mgmt., Inc., No. 10 Civ. 374 (RJH), 2012 WL 288041, at *17 (S.D.N.Y. Feb.1, 2012) (collecting cases and

17

observing that although there is no "bright line" rule, courts in this Circuit generally consider a delay between the plaintiff's protected action and the employer's adverse employment action of six weeks or less to permit an inference of retaliation and a delay of two months or more to counsel against one).  Finally, although plaintiff alleges at times that he was fired on April 19, plaintiff' transcript of the April 19 conversation indicates that he quit his job, not that he was fired.  See, e.g., Rooney Aff. Ex 1 (Transcript) at 5 ("FERNANDO: . . . . You know what?  This is it, I won't be callin' you no more.").

In addition, plaintiff himself proffered a legitimate, non-retaliatory reason for the reduction in his hours.  When questioned why he believed his hours had been reduced, plaintiff's testified that his hours were cut because he failed to show up for work on a certain day, not because he complained about racial harassment.  Plaintiff explained he had failed to come to work on a Saturday when Rooney had scheduled him to work:

> A: [A]fter that that [sic] I didn't come in [to work], that's when more things started to happen.
> Q: Like what?
> A: You know, days started being taken away from me.  My keys got taken away from me. . . .
> Q: So up until this particular incident where you were unable to work, things between you and Chris were pretty solid?
> A: Right.
> Q: Now after the poster goes up and you're unable to come to work, what are the things that Chris does?
> A: He starts taking days off of me.

See Marrero Dep. at 77-78.  Plaintiff made similar allegations in his April 19 recorded conversation.  See Rooney Aff. Ex. 1, at 5 ("You know, all of a sudden you got pissed off that one time that I called you and I couldn't come in that Saturday, you called me that week after and come in and took the keys from me.  Right?  That's where the shit started.  And ever since then, you had a grudge against me, all right?").  Where an

18

employer presents evidence of a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to show that retaliation was a substantial reason for the adverse employment action. Jute, 420 F.3d at 173. Here, plaintiff himself proffered the non-retaliatory explanation and has provided no evidence that it was pretextual.

For the foregoing reasons, plaintiff has failed to show a causal connection between his protected activity and any adverse employment action. Because plaintiff has failed to establish a prima facie case, defendant's motion for summary judgment on plaintiff's retaliation claims must be granted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted as to plaintiff's Title VII and NYSHRL retaliation claims and denied as to all other claims.

**SO ORDERED.**

Dated:   Brooklyn, New York
         August 16, 2012

                                        ____/s/_____
                                        I. Leo Glasser
                                        United States District Judge